The second case is United States v. Bellinger and Mr. Walker. We're ready to hear from you. I take it you and Ms. Davis are going to split the argument? Yes. Good morning. May it please the Court, I will make a presentation on the first two legal issues that we presented in our brief, and Mary Davis, she will present on the third issue. We represent Kevin Bellinger. Kevin Bellinger is an inmate in the federal prison system who went to trial in a prison murder case two years ago. Mr. Bellinger was convicted because the district court wrongly limited Mr. Bellinger's ability to develop the two defenses that we presented at trial, and the district court entirely prohibited a third defense that we sought, which is the question today of imperfect self-defense. That was a defense that was necessary for us. As a result, he was convicted of two offenses, the first offense, murder by a federal prisoner while serving a life sentence, and the second offense was second-degree murder, both based on the same incident at the prison facility. I will argue today that it was an error for the district court to exclude testimony about threats by the decedent, Mr. Jesse Harris, to stab the co-defendant, Patrick Andrews. I will also argue that it was an error for the district court to exclude testimony about the decedent's prior criminal history that was known to Mr. Bellinger at the time of the fight. Counsel, it strikes me that the force of the two arguments that you're going to make is directly related to whether or not Mr. Bellinger gets the imperfect self-defense defense. We're glad to hear from you on that point, but it would seem that if he does get it, it changes the value of what you're going to talk to us about. That's right. The evidentiary questions and the limitations that were placed on the defense at trial are relevant to the imperfect self-defense claim. We believe, I think this is the bottom line, that had we received the instruction on imperfect self-defense and had the defense been permitted to develop the threats that occurred and to develop Mr. Bellinger's knowledge of the decedent's prior criminal history, that the result would have been very different. I certainly can articulate our position on the evidentiary issues, which is not vastly different than anything we put in our briefs. I certainly am probably the person of the many people in this case who can explain all of the idiosyncrasies and facts of the prison and the case itself, because of course I tried the case and I've been working on it since 2008. Mrs. Davis, Attorney Davis, she can present our argument on the imperfect self-defense claim. Go ahead and tell us what you want to tell us so you have a good use of your time. Yes, sir. I think that the facts of the case are important. I'll just summarize them very quickly for the court. Mr. Bellinger, of course, was an inmate serving a life sentence from D.C. On the day of the incident, October 7, 2007, Mr. Bellinger was playing basketball on the outdoor recreation yard. No problems that day. No problems with Mr. Harris, no problems with Mr. Andrews. All of a sudden, around 6.30, when the inmates are told to move, he sees an inmate run off the recreation yard. He thinks that's strange. He sees Mr. Andrews, the co-defendant, run off the recreation yard after his first inmate who ran off the recreation yard. Then he sees the decedent, Jesse Harris, apparently chasing after Mr. Andrews. So Bellinger, knowing that these other inmates are his friends, runs in to see what's going on. He goes into the facility, turns right, sees Harris pursuing Andrews, sees Harris apparently argue and gesture aggressively while he's talking with Andrews,  and then he hears, Bellinger hears Harris threaten Andrews, and Harris said, I'm going to stick steel in you, which Bellinger, of course, understood that Harris was threatening to kill Andrews. Harris and Andrews fight. Bellinger believes that Harris is attempting to kill Andrews. Bellinger gets involved in the fight, tries to protect Andrews. So we argue at trial that this was a claim of defense of others. Bellinger acting in defense of Andrews. We also argue at trial that because it was really an upsetting situation for Bellinger, that this was a manslaughter, not a murder, because Bellinger never had the intent to kill. That's the background. Our evidentiary, I'll just talk together, I'll combine the two evidentiary issues. I thought your argument was that he did have the intent to kill. It was just an unreasonable belief of self-defense. Well, that was the third defense. We never were able to present that argument to the jury because we never got the imperfect self-defense instruction. So first we argued that Bellinger should be acquitted because it's a claim of self-defense, defense of Andrews. The second argument was simply there was no murder because there was no intent to kill, no second-degree murder whatsoever, instead manslaughter. What we intended to argue, and what Ms. Davis will explain, is that if those two defenses are not accepted by the jury, there was a third option, which is imperfect self-defense, which fits perfectly based on the facts of our case. Had we been able to present evidence of the threats by Harris, which is my claim of error, had we been able to present evidence that Bellinger knew Harris, it's terrible that he died. It's terrible that he died. Bellinger never wanted to be involved in any of this. They were friends. They all were friends. But had we been able to present that Bellinger knew Harris was not just some man. Harris was not just some inmate. Harris was a known killer to Bellinger. Harris was a known killer who had recently, at USP Hazleton, in the same year, assaulted another inmate with a weapon. Bellinger knew that. So this was a very... Did Harris see the videotape? Yes, we all saw the videotape. Yes, they saw the video. And the video... Even if the jury had heard the items that were excluded, the government argues with some backup from the physical evidence and from Mr. Bellinger himself that he never saw a weapon on the victim's behalf and that he and Mr., the other inmate, were basically the aggressors and that the victim is seen backing up and backing away while they continue to attack. And after the other inmate leaves, Mr. Bellinger just keeps on going. Well, he did. He keeps on stabbing. He actually didn't. He withdrew from the fight, just as Andrews withdrew from the fight. This was not... You say that's what the physical evidence shows. It's what the video showed. Bellinger withdrew from the fight while Harris was actively fighting Bellinger. This is not what we call a prison hit. I've now become an expert in prison assaults. This was not a situation where the inmates continued to attack and attack and attack until someone's incapacitated. The video didn't have sound, right? That was a big problem for us because unless the testimony of Gerald Osborne was presented about the threat, then we had no way of corroborating what Bellinger told the jury. Bellinger told the jury that Harris was the aggressor. Talk about the aggressor. Harris was clearly provocative. Harris clearly was inviting this fight. My time is up. Sure, thank you. And Harris... It's not clear whether Bellinger and Andrews were the aggressors. In fact, Harris pursued Andrews. When have you ever seen a murder case where the alleged victim pursues the primary defendant? That's not how it's supposed to go in a murder case. Usually the person who is the defendant, the perpetrator, chases down the victim. And here we have the reverse. So the circumstances were unusual in terms of a murder case, and it came down to what was in Bellinger's mind. We weren't permitted to prove that fully, and we objected. And the government doesn't dispute that there are errors there. And we weren't permitted to advance a third lawful, relevant, and related defense. We think it was an unfair trial. Thank you. Yes, sir. Thank you very much. Yes, sir. Good morning. May it please the Court. I'm Mary Davis, also representing Mr. Bellinger. As Mr. Walker indicated, I will be addressing the issue of whether the district court erred when it failed to instruct on imperfect self-defense of another. Now the standard of review is abuse of discretion, and that is satisfied when the instruction requested is correct, when it is not covered by the other instructions, and when it deals with some point in the trial that is so important that failure to give the instruction impaired the defendant's ability to conduct his defense. So tell us why an imperfect self-defense instruction was correct. Why should it be recognized? I think, well, as the Court requested supplemental briefing on, according to Gore, that you have to go through a certain analysis to determine whether an instruction or defense should be allowed in a case. The first issue to be, according to Gore, you first have to look at whether the statute is in some way limited by exceptions, such as in, I think it was Oakland Cannabis. At the sex of the manslaughter, I mean the second degree murder case, there are no exceptions to it. So therefore, according to the first factor in Gore, we satisfy that. The next factor to be determined under Gore is you have to look at the particular circumstances of the case. In Gore, the circumstances of the case were the competing interests of the government in providing a safe prison environment and the right of an inmate to protect himself from excessive force. Now, imperfect self-defense is not in the federal code. So the question then becomes can a court recognize it in some implicit way? And Gore seemed to imply you make an inquiry as to whether or not there's some common law background that would bring that to the attention of Congress so that you could imply such as a necessity defense, which courts have implied, even though that's not written into the statute. So what common law background would you cite to say that imperfect self-defense is viable? Well, it's cited in our brief. Imperfect self-defense was first recognized in 1882 in the Texas case. It was recognized and discussed in a Law Review article in 1935. It is recognized in a number of states as well as three circuits. So I think it's pretty common knowledge that there is this thing called imperfect self-defense. What's the distinction between perfect self-defense and imperfect self-defense? Imperfect self-defense, the jury is allowed to consider whether the defendant reasonably, if he believed that there was an imminent danger as opposed to whether it was reasonable to believe that. That's the difference. This is subjective versus objective. So why should we think that when Congress adopted these statutes in the 1940s that there was some implicit recognition of imperfect self-defense? Certainly at that time, and even today, you have a minority of states that recognize it, and most of them, I think, recognize it by virtue of statute, not because of a common law rule. I believe it's a combination. I don't have off the top of my head which states are which. But as we also pointed out in our briefs, there have been, I think, six amendments to that statute, and the circuits that have approved imperfect self-defense, that was known to Congress at the time of at least the very last amendment, but they chose not to exclude it. So I think it's an open question in the circuits. I think only one circuit has disapproved it. That would be the Eleventh Circuit. Granted, most circuits have not addressed it at all, but, again, there are three circuits that have approved it. Well, if we look at the plain language of these particular statutes, which is what gives me some pause about your argument, the circuits that have adopted the imperfect self-defense have recited basically the two prongs. The Ninth Circuit has done it, I think, several times, and they've said we can have imperfect self-defense in two types. The unreasonable belief, which is what you asked for in this case, or essentially a second brand of criminal negligence can function as that. In formulating the manslaughter and murder statutes, the Congress has explicitly stated involuntary manslaughter, a language that would cover the criminal negligence portion of an imperfect self-defense argument. So it's very specifically included there. Here you ask for the unreasonable belief prong to come in as a form of voluntary manslaughter. Am I right in that? Correct. But in enacting the voluntary manslaughter statute, the Congress has very specifically said it's a crime of passion. It's given you a very specific, limited definition for voluntary manslaughter. So what basis would a court have to import this other prong, the unreasonable belief prong of imperfect self-defense into voluntary manslaughter when the Congress would appear to have excluded it in its definition of voluntary manslaughter, and it certainly knows how to include the other portion of imperfect self-defense in the involuntary manslaughter statute. My first suggestion is that you look at Section 1111 first off to see if there are any exclusions there because that is what we were requesting an instruction on. Well, you wanted an instruction for voluntary manslaughter, and you've got the manslaughter statute divided between voluntary and involuntary, and the Congress seems to have spoken fairly clearly on what it considers to be included in each set of manslaughter, and the unreasonable belief instruction isn't in there. Let me follow up with that just a minute. Voluntary manslaughter charges are often given, for example, a husband walks in his house, his wife and boyfriend are having sex, and he shoots and kills them. Well, that's a crime of passion. Exactly. Now where's the crime of passion here? Where is the crime of passion? Well, apparently the jury didn't find any crime of passion. No, but from your point of view. From our point of view is that it was because Mr. Bellinger believed that his friend, Mr. Andrews, was going to be attacked by the victim, and so he wasn't obviously thinking straight. He was acting in anger. He was upset, and that's why he went to defend Mr. Andrews in the same way that a husband would kill the wife when she's with the boyfriend. That was the argument, I believe, on the crime of passion. Would you ask for a voluntary manslaughter instruction based on crime of passion? Yes, I believe. The court gave it. Yes, yes. But this is separate and distinct. I understand that. That's why I'd like to bring you back to the statutory argument. Okay. Again, our argument is that under the second-degree murder statute, that is where you have to start the analysis because that is what the imperfect self-defense would apply to. It wouldn't apply to the manslaughter statute. It would apply to second-degree murder. Well, it would have to apply to that because you wanted voluntary manslaughter. Right, because by having the imperfect self-defense, if the jury found that, then they would default automatically to voluntary manslaughter. Again, I believe the analysis has to look at second-degree murder, not manslaughter. I don't know if this is making sense, but I think that's what the focus has to be on. Once the jury finds that there was a belief on Mr. Bellinger's part, then automatically it would default to the manslaughter statute. Again, I don't believe that the voluntary manslaughter statute is complete in its exceptions, as it wasn't. Voluntary manslaughter doesn't have any exceptions. It just has a definition. This is what's voluntary manslaughter. Okay, and that's what we requested. I mean, that's what it would default to. Anything else you want to tell us? Not right now. Okay, thank you. Thank you very much. Mr. Cogar. May it please the Court. My name is Andrew Cogar, and I represent the United States. The appellee in this matter, I'll address first. The imperfect self-defense issue, since I agree with you, Judge Agee, that, as you identified, the crux of this appeal is the imperfect self-defense instruction, whether or not it was given and the other two issues in the case are inextricably connected to that. Of course, the government contends that the Court properly refused that instruction. As the Supreme Court emphasized in the Oakland Cannabis case, statutory exemptions, like the one requested as part of the instruction, are a matter generally of legislative judgment, not judicial inference. And as this Court acknowledged in the Gore case, that there's a limited recognition of common law defenses to federal crimes, which depend on whether or not Congress contemplated that type of defense at the time of enactment based on a review of the common law principles that were in play at the time. What's the common law origin of imperfect defense? Well, I'm glad you asked, Judge, because first I think it's important to distinguish imperfect self-defense as defined by the appellant and imperfect self-defense as understood historically in the cases that they've cited in their supplemental briefing and also in the opening briefing. Starting on that note, there's a critical distinction between those types of imperfect self-defenses that are defined historically and currently. As defined by Mr. Bellinger and his counsel, imperfect self-defense obviously directs a verdict to manslaughter based on the subjective and even unreasonable intent or belief of the defendant that he or she is under an imminent threat of serious bodily injury or harm. That's one type of imperfect self-defense, but there's also a second type. That's correct, Your Honor. Historically understood, it generally takes the form of a three-element analysis. First, it involves an incident where a defendant provokes a victim somehow, often by words or actions, but it can be multiple ways. Secondly, in response to that provocation, the wrongful provocation, the victim attacks the defendant. Third, in response to that attack, the defendant kills the victim. In those incidents and those circumstances, as historically understood, the courts have acknowledged that while the use of self-defense in those circumstances were necessary, the defendant bore some responsibility for the initial attack by the victim to begin with and therefore they granted an instruction and permitted a jury to find that the defendant was guilty of manslaughter in those instances. The authorities cited by the defendant acknowledge and adopt that kind of imperfect self-defense instruction or theory from the early 20th century case law and the law review article that were cited. In the State v. Swift case, the North Dakota case, for example, in 1926, that court held that imperfect self-defense applies when the defendant commits a wrongful act that eventually necessitates the defendant's use of force to defend himself. And then in the State v. McEvoy case, that's a North Carolina Supreme Court case from 1992, which was cited in the appellant's opening brief, that court adopted a similar definition of imperfect self-defense as the North Dakota court and went further and explicitly rejected the type of imperfect self-defense theory that the appellant requests now. And then the appellant in her statements today before the court noted the law review article from 1935 in the St. Louis Law Review article with respect to imperfect self-defense. That particular law review article defines imperfect self-defense at the time, and it says, and I quote, if the defendant himself was in the wrong and as a result was placed in a situation necessitating the killing, the law limits his rights of self-defense according to the magnitude of his wrong, which in turn is measured by his intent in provoking the difficulty. So again, there's this idea of a necessary reaction by the defendant to act in self-defense, which he in turn was responsible for provoking to begin with. In a similar vein, the Milk case, the Eighth Circuit case cited by both parties in their briefs, states that an imperfect self-defense claim is premised on the view that some action was necessary for the defendant to protect himself. That's on page 599 of that case. Now here it's undisputed that this type of imperfect self-defense, this historical theory of imperfect self-defense is not present in this case. It's simply not applicable. There's no evidence or argument in this case that the victim actually attacked the defendant, Mr. Bellinger, or that Mr. Bellinger provoked the attack to begin with. And Mr. Bellinger . . . There's no evidence that the victim attacked Mr. Bellinger because the only corroborating or threatened to attack him because the only corroborating evidence was excluded. Are you going to talk about the evidentiary issues that I think the government has to deal with at some point? Certainly, Your Honor. I'd be happy to do that. With respect to that, and I'll delve into that more deeply in a moment, but I'll just address that specific question now as it relates to the threat. There was only evidence, which actually Mr. Bellinger also testified to personally, of a threat by the victim. There was no evidence. He stabbed somebody. Exactly. There was no evidence, by contrast, of a physical action, an aggressive initial action by the victim toward either the defendant, Mr. Bellinger, or the co-defendant, Mr. Andrews. Because the fact that he was capable of such a thing because he had done it almost precisely the same thing nine months earlier was also excluded. So I actually just want to hear how the government can say that exclusion of those two pieces of evidence, considering the self-defense here, was harmless. How could the exclusion of those two pieces of evidence possibly have been harmless here? Well, first, they require somewhat of a, in the government's view, somewhat of a different analysis. For Mr. Osborne, the inmate testimony relating to the threat that was excluded, the government acknowledges that that evidence was admissible. And so the harmless error obviously applies for purposes of the government. As to the second exclusion of the evidence that's disputed, that is the ---- So Mr. Osborne's testimony was admissible and that it was error and that it was not harmless? That it was harmless. Okay. How was it harmless? Your Honor, it was harmless because in applying the standard that the court must evaluate with respect to harmless error, the court has to assess the centrality of the error to the issue in the case, the issues in the case. Secondly, any steps taken to mitigate the impact of that error. And here, that's not applicable because there were no steps by the district court to mitigate the impact of that error. And third, and most importantly, the closeness of the case. With respect to the centrality of the issue, that's what connects back to the imperfect self-defense claim. I think that's what Judge Agee was getting at earlier. The appellant ---- Does your harmless error argument depend on whether or not the defendant's entitled to the imperfect self-defense instruction? Because it seems to me that it's markedly different as to whether he is or he isn't. Because you have to know what does the evidence relate to. Well, I think that I agree in as much as that the analysis is different if the imperfect self-defense instruction could apply. If it does apply, the focus then becomes less on the centrality of the error to the issues in the case. It becomes more central. There's no question because subjective intent becomes more of a prominent part of the case. Your case becomes much more difficult if the imperfect self-defense instruction should have been given. I would agree it becomes more difficult. There's no question. I still think the government wins, however, based on the fact that the case was not close. Does an unreasonable belief that self-defense is warranted negate malice required for secondary to murder? If the imperfect self-defense instruction would apply, but otherwise, no, Your Honor. There's no historical precedent in this circuit. And as the government's already explained, there's no common law basis to import that defense in the murder statute. But to finish up the issue with respect to the evidence, and I would like to go back to the imperfect self-defense question as well, the centrality, focusing on the centrality of the issue, of the error as it relates to the issues in the case. The appellant has argued, of course, with the mindset of the imperfect self-defense instruction being applicable, that the case boiled down to the defendant's state of mind. Of course, it's the government's contention it did not, in large part because the imperfect self-defense instruction does not apply. But in all events, if we look to the court's own precedent, if you look to the Fleming case with respect to the element of malice as part of the murder statute and what it requires, Fleming held that to prove that the requisite element of malice for second-degree murder, to prove that element, the government's not required to show that the defendant intended to hurt or kill the victim. And so the core issues in this case are the reasonableness of the defendant's belief that the victim posed an imminent threat of death or serious bodily harm and whether or not he acted objectively with malice. Since it's the government's contention and, again, the common law establishes pretty extensively that imperfect self-defense is not applicable, the defendant's subjective state of mind cannot, by itself, mitigate his criminal liability. Measure malice by an objective standard, whether or not you're proving it by direct evidence, which is often going to be hard to get, but direct evidence of malice or by reckless disregard. Correct, Your Honor. Malice can be inferred by the jury by the objective nature of the defendant's actions. Either means you have to have an objective proof of malice, not subjective. Correct, Your Honor. There can be subjective proof as well if the defendant has an express intent to kill. That also satisfies the element, but that's an alternative way of proving it. And, moreover, since mere words legally cannot justify a deadly attack in response, the victim's mere words in this case, and that's what we're focusing on with respect to this evidentiary issue, have limited probative value. And insofar, and I mentioned earlier, insofar as the case, in fact, boiled down to Bellinger's state of mind, regardless of the applicability of the imperfect self-defense instruction, Mr. Bellinger testified in this case. And there could be no better evidence than that testimony as related to his state of mind. And, in fact, he... Better evidence would be, I mean, a jury may look at the person testifying with some suspicion that maybe what they're saying is self-serving. So better evidence would have been another person in the area who also heard it, particularly since the video didn't have sound. And the judge did instruct on heat of passion that may be provoked by, one thing, fear. And having heard that somebody, that he was going to stab someone, which he had done nine months prior, would have been better evidence, don't you think? I think it would have corroborative value, but I want to speak to a couple things that Your Honor has mentioned. You've mentioned the prior stabbing nine months earlier, and I just want to address that. There's no dispute in this case, or by the government at least, that there was an assault that involved Mr. Bellinger in January of 2007. That case was not prosecuted.  And so the facts of that case were not fully developed. At the time of the incident, Mr. Harris, the victim in this homicide, claimed that the statements relating to that incident were not true, but he did not make a statement at the disciplinary hearing in the prison. The evidentiary facts of that case were never developed, so there's every reason to think that... No, but didn't Mr. Bellinger observe it himself? I believe that was what he claimed to have testified, but what the government's point is, or would have testified, but what the government's point is this, that had he done so, because those facts weren't developed, and because the person involved is now dead, it does create a substantial risk of collateral mini-trials, that there's disputed facts relating to this peripheral issue or collateral issue that is collateral to the substantive issue of intent. We don't know, and we never will know. The government, I mean, I thought the government had agreed initially that this sort of testimony could come in. You never said we don't know that that had happened. You didn't say at trial when you objected either. Well, I think that the, well, I can't speak to counsel at the time, but I do believe that there was some acknowledgement that some of that evidence could have come in, yes. Right, because you're the government, so you can speak for the government. Well, of course, Your Honor. I just can't speak for the counsel at the time and what they were thinking, but suffice to say the evidence with respect to the prior violence created a risk of collateral mini-trials. And with respect to that issue, because that goes to the other basis for excluding that evidence, which is a Rule 403 analysis, which the government believes is dispositive in that the court's decision on that issue should be reviewed for abuse of discretion, that the court's decision on that particular evidence and excluding that evidence was neither arbitrary or irrational. And that's what the court has to find in order to find that there was error there. The government obviously still believes that that evidence, to the extent it was error, the exclusion of that evidence was harmless. But that being said, the closest of the case in either event is a prominent issue for the court to assess. And here, and of course it's the most important factor, again, as this court has identified on several occasions, but here the evidence clearly and overwhelmingly shows that Mr. Ballinger committed murder. The brevity of the jury's deliberations reflected that fact. That's a factor that the court can and has considered in making that analysis. And the undisputed facts are simple. Mr. Ballinger and his co-defendant, Patrick Andrews, effectively blocked the movement of the victim at the time of the assault. They initiated the attack. They walked side by side toward the victim as he backed away. And the victim was always in a defensive posture. Irrespective of what he may have said, he was always in a defensive posture. The defendant and the co-defendant stabbed the victim 22 times. The victim was unarmed. There's no dispute about that. And there's also no dispute that either defendant, neither defendant, suffered any injuries. Apparently there is some kind of dispute about the extent to which Mr. Ballinger continued to stab the victim. The video and the evidence shows that he did, in fact, continue to stab the victim after Andrews walked, not run, did not run, but walked away from the incident. Ballinger continued to stab the victim during that time and did so until correctional officers intervened. And then after that, Ballinger and Andrews tried to dispose of the evidence. All of these facts show convincingly that this was a murderous assault. This was not a defensive type assault, regardless of their intent. It was a murderous assault. I also want to address briefly the assertion made by appellant today about the victim pursuing Andrews off the recreation yard that day. I think that happened, to the extent that happened, I think the evidence is disputable about that. But to the extent it did happen, it was a significant time period earlier than what the assault occurred. Leading up to the assault, Andrews was walking and Harris was walking. And Harris, again, walked through this gate, this grill in the prison corridor and stopped. He waited. So he obviously was not being chased by the victim at that time. And there's no dispute also that the victim never chased the defendant, Kevin Ballinger. And additionally, with respect to Jerry Osborne, the inmate who testified on behalf of the defendant at trial, he testified that at the time, Mr. Ballinger, the defendant, was not agitated, was not agitated just immediately before the attack took place. So this cuts really strongly against the argument of heat of passion and even the subjective self-defense argument. Ballinger also testified that he didn't know why the victim, Andrews, and another inmate ran from the recreation yard from the prison. And that's why he followed them to find out what happened. So this idea that Ballinger started, or excuse me, that Ballinger joined a fight that was involving Andrews is just simply a mischaracterization. Ballinger started this fight alongside of Andrews. So given the nominal significance of the excluded testimony and the weight of the government's evidence, these errors could not have substantially swayed the jury's conviction. And again, as it relates to the evidence of the prior violence that Mr. Harris, the victim, was associated in, that was not arbitrary or irrational to exclude by the judge as well. Your Honor, as I see my time has expired, I would just reiterate that there's no basis for the imperfect self-defense instruction, the common law, and that the court's judgment should be affirmed. Thank you, Mr. Cougar. Mr. Walker. I'd just like to briefly respond to some of the points that Mr. Cougar raised. And, of course, all you have to do is read the briefs and you see that the government has a vastly different version and interpretation of the facts from the defense. And now I don't want to retry the case, despite sort of my instincts as a trial lawyer, but I will say that I think that that's remarkable that the parties are so far apart in terms of what occurred because it's all on video. So what that tells us, I think, is that the other pieces of evidence that would help the jury understand what was going through Mr. Bellinger's mind, they were outcome determinative. And, of course, the jury instruction, which we did not receive, in our opinion, is outcome determinative because the interpretations of the facts are different, the explanations of what Mr. Bellinger must have been thinking is different. Had we the additional evidence, we think the jury could have made sense of this case in a different way. Well, let me ask you this. Voluntary manslaughter was an option given to the jury. Right. So let's assume that there were the two evidentiary errors. Could you say that you could have gotten to voluntary manslaughter without the imperfect self-defense? Absolutely, absolutely, because there is a colossal difference between witnessing a fight or an attack. On the one hand. And on the other hand, what we sought to prove, witnessing an attack by a known killer who has access to weapons and who has recently attacked someone else with a weapon that same year in the same place. That's what upset Bellinger. That's why he feared for Andrew's life. That's why he got involved. Just to answer your question, if we had those other pieces of evidence, the jury, I believe, could have easily come up with a different verdict. I'm not surprised by the verdict. If I was on the jury and I didn't know that Harris was an armed killer, and if I didn't know that there was corroborative evidence of his threat, Harris was very aggressive. And you can look at the joint appendix, you can look at the pictures, and you can see. If I would have permission just to move for a moment. I know my time is up again. May I? Go ahead. Harris didn't just walk up to Andrews and threaten him. Harris was pointing at Andrews, egging him on. Harris ran his fingers across his throat. It's an old style gangster move to indicate, I'm going to kill you, while he was saying, I'm going to kill you. And here's what was the game changer. You see it in the pictures, you see it in the video, and there's testimony about this. He starts grabbing at his pocket, posturing and grabbing at his pocket. Every police officer knows that if someone takes their hands and starts reaching for something in a hostile situation, that that's a threat. You get shot. And that's what is the interpretation of it in the prison. He's reaching for his weapon. You don't pull the weapon out until you need it, because you're on video and you're in prison. But you tell everyone, look what I've got. Look what I've got. I'm going to kill you. Look what I've got. That upset Bellinger. That upset Bellinger. The jury didn't get to hear the whole story, and they certainly didn't get all the jury instructions. So we have a different way of interpreting the facts. We have a difference in terms of explaining what Bellinger understood. And we believe that had the additional evidence been available for the jury, had they known the whole story, we would have had a voluntary manslaughter verdict, which is what we asked for. But without the imperfect. Without it. And had we had the imperfect self-defense, we would have had two available avenues toward that. But we just didn't have the evidence on the one hand. We didn't have the evidence. We needed one or the other or both. We didn't get any. So obviously a serious case. Obviously a serious outcome here. We always wanted a full and fair trial for Mr. Bellinger. We frankly, with all due respect to the district court, we just didn't get it. Thank you. Thank you, sir. Ms. Davis. Thank you. Getting back to Judge Agee's question regarding a manslaughter, it is true that this statute talks about sudden quarrel and he has a passion for voluntary manslaughter. The problem, we submit that imperfect self-defense can fall under this category. But the problem in this case is that the jury was instructed, heat of passion may be provoked by fear, rage, or terror. The provocation, in order to be adequate, must be such as might arouse a reasonable person in the defendant's position to kill someone. The jury, therefore, was restricted solely to what the reasonable objective standard was. Right. Which is what the voluntary manslaughter statute provides for. But the voluntary manslaughter statute itself does not say that it's a reasonable person standard. You got a case that says it's any different from that? I do not, Your Honor. Here's what I think my colleague is struggling with. There's no common law basis for finding imperfect defense. And then, obviously, there's a statute. Right. So that's why I ask your colleague, could you have gotten to voluntary manslaughter without having an imperfect defense? I think so. I mean, having the imperfect self-defense definitely would have strengthened the defense and the options for the jury. But I think if this other evidence had come in, I think it's very likely that the jury would have found manslaughter based on heat of passion as defined even under the reasonable person standard. So unless the Court has any other questions. Thank you very much. All right, thank you.
judges: G. Steven Agee, Henry F. Floyd, Stephanie D. Thacker